Lawyers, please approach the bench and introduce yourself, please. May I please have the Court, Counsel? Oh, I'm sorry. Gabrielle Green with the Office of the State of Colorado. Assistant State's Attorney Whitney Vaughn representing the people of the State of Illinois. Okay, let's proceed.  Good morning. On behalf of the respondent, Rafeal E., there was one issue on appeal. That was whether or not the trial court erred in denying Rafeal's motion to suppress, where the record indicated that Rafeal was unreasonably seized. Now, here there was a seizure. There was a seizure because Rafeal was, the officers approached Rafeal. They immediately ordered him to stop. At least one of the officers approached Rafeal and then told him to put his hands straight up in the air. Did the officer, I just want to correct you on something. In the testimony, did the officer say he told him to put his hands straight up in the air? Or did he say, I asked him to take his hands out of his pockets and then he put his hands straight up in the air? No, the record indicates that the officer said he put his hands, told Rafeal to put his hands up. The judge misinterpreted or misstated the evidence and indicated that he told him to put his hands out of the pocket, but that is not supported by the record. The record indicates he told him to put his hands up. And what page of the record says that? I don't have that up here. Okay, that's all right. Are there multiple points in the transcript when the officer testifies? Yes. I would say I think at least twice the officer said that he told him to put his hands up. Is there multiple times where the officer says I asked him to take his hands out of his pockets? I'm not sure. But I believe that that issue was clarified specifically as to whether or not he asked him to put his hands up. And the testimony was that he was asked to put his hands up. There's a portion of my brief where I do indicate what the court's ruling was, and I did put a footnote indicating that the court did misstate what the officer's testimony was. Well, I've read the record multiple times, and I think that there's multiple points where the officer says I asked him to take his hands out of his pockets, and then I think he's asked something about did you ask him to put his hands up in the air, and he said no, and then he said I don't know. So anyway, there's multiple discussions about that. Very bad, I think, Ms. Green. Okay. Yeah. I would suggest, though, Your Honor, that if Raphael put his hands straight up in the air, that that is not something that he would have done unless he was ordered to do so. Putting one's hands up in the air is not something you would ordinarily do, especially if you had something to hide and you would take your hands out of your pockets and put your hands down. That's normally what individuals do. Doesn't the judge get to listen to the evidence, observe the testimony, and draw his conclusions as far as the facts? Yes, but I believe that the facts have to be consistent with what the testimony was. So if the testimony clearly supports that the officer, when asked what did you ask him to do, and he said I asked him to take his hands out of his pockets on more than one occasion, would the trial court's finding of fact be against the manifest way to the evidence? Not as to that particular issue. Point. But there was still a seizure here because he was ordered to stop, approached by at least one officer. And I still maintain that he was told to put his hands straight up in the air. Just the fact that he did that, it's such an unusual thing to do. It is. Unless you were told to do so, and told to do so with a particular tone. But where is the testimony about a tone? There isn't testimony about a tone. What I'm suggesting is that if somebody puts their hands straight up in the air, then you can imply a tone just by doing such an unusual. And what case says you can imply a tone from that? No case says that. Oh, all right. That's my suggestion based on Rafael's actions. That's common sense, is it? I would say that that would be common sense. Now, at the circuit court level, the state argued that there was sufficient reasonable suspicion for the stop. However, on appeal, the state now changes it and primarily argues that it's a consensual encounter. And in doing so, they cite several cases as to what a consensual encounter is. However, none of those cases are what happens here. And I would argue, Justice McBride, that they do change the facts to make it more of a consensual encounter. They say that he was asked to stop and that he was asked to remove his hands from his pockets, which is not consistent with the record. Was this a valetary step? No. The officer didn't point to any reasonable, particular facts to justify the stop. Well, what did the court base its decision on? A kind of a just it was all right to approach. And then I think the court said that when he asked him to take his hands out of his pockets, instead of just taking his hands out of his pockets, he raised his arms up straight in the air. His shirt then exposed his waist area and underwear and pants. And it was quite low. And that he saw a plastic bag, which, based upon his experience, looked like it was narcotics. So he removed it. That is the case. I'm sorry, but wasn't his opinion sort of bottomed on this idea, plain view, the trial judge, after this initial encounter? Yes. Okay. But here, there was no observations of criminal activity when the officer first saw Rafael. In fact, he said that he wasn't engaged in criminal activity. The only thing he did was walk away when the officer was approaching the area. Now, doesn't that alone make it different than Illinois versus Wardlow, where there was a headlong flight? Yes. Here he was just walking away, no headlong flight, not running down an alley. Yeah. Wardlow was running, and here we're walking. Yes. But when you're fleeing, you're evading the police. There's nothing to suggest that he was evading the police. He could have gone down the alley. He could have run. There was nothing to suggest that he was evading the police. Well, why did the officer testify that he was in – first of all, the officer testified he was in an area known for narcotic sales, and he made several drug arrests since March before this actual arrest. And he said he observed four to six young men in the mouth of an alley, and that upon seeing the officer, the respondent walked briskly away and saw him put his hands in his pocket. He went around to talk to him. He asked him to stop walking. He asked him, would you remove your hands from your pockets? That's how I've read the record. And then there was direct, and then it was cross, and then there's the trial itself. So was that kind of the testimony? Have I accurately reported it, or is there something? I wouldn't say that that's an accurate reporting based on the discussion we had earlier. But with respect to the orders, I believe he was ordered to stop and ordered to put his hands up. But he did testify that it was a high narcotics area. He did testify that he'd made several arrests in the area. However, it's just got to be more than just stating a buzzword of it's a high narcotics area  There's got to be some sort of nexus that connects the crime, the narcotics sales that characterize the area, and the behavior of the respondent in this case. Here there was absolutely nothing. There was nothing that the officer pointed to that would suggest that Rafael was acting, in any similar matter, to a narcotics dealer, a narcotics seller. He didn't seem to be a lookout. There was nothing that he was doing other than standing, and he did indicate that he was not. Can the officers walk up to a citizen? Yes. All right. They can. Yeah. And aren't there factors that the courts normally look at to decide whether, if you're not going to say it's a consensual encounter, whether or not this was a command that he had to comply with? Absolutely. And both of you agree, don't you, that the only factor we're looking at is whether this was a show of authority, the conduct of the officer. There's no other Mendenhall factor? I would say that there is. Oh, okay. Where are they? If he didn't take his hands out of his pocket, what would have happened? His pants may have fallen down. That could have been why he had his hands in his pockets in the first place. But I would suggest. Well, wasn't he at the alley without his hands in his pockets? I don't believe that the record is clear on that. I think the record, again, I've read it multiple times, I think the officer says that when he walked away briskly, that's the word he used, he put his hands in his pockets. So his pants hadn't fallen down in the alley. But he was also standing. I would also suggest that once he walks and his pants are low and that's characterized by a lot of waddling when they're walking and his hands could have been in his pockets to keep his hands up. Sure. But I'd like to respond to what you indicated with respect to the Mendenhall factors. I would argue that it's possible that the presence of several officers is up. Granted, it's two against one juvenile, but it is two against one juvenile. Well, how many officers approached him? I believe the record is silent as to what the second officer was doing. Okay. But I'd also like to say. In your brief, did you ever suggest that there were more than one officer, there was more than one officer that approached him? And doesn't the record show that this officer is the only one that got out of the car? And, in fact, they didn't use the car in any way to prevent his movement. That's true. But I don't think that means that there wasn't a show of authority or something preventing him. Then my other question is, did you ever mention in your brief that there was a show of authority? Has that been argued? Yes. There was a show of authority when he was ordered to stop and ordered to put his hands straight up in the air, indicating that, you know, no reason to. No, I'm sorry. I meant this other idea about multiple officers converging. No. Okay. But I would suggest that where the officer indicated that he told, ordered Rafael to put his hands straight up in the air because of officer safety issues, that if there were officer safety issues, then both the officer and his partner would have been out of the car if it was a legitimate issue with respect to officer safety. So if both officers were not out of the vehicle, then that would cut into the officer's testimony that there was an issue with respect to officer safety. What's your best case for saying that asking someone to take their hands out of their pockets is a seizure? Best case. Give me the best one you've got. I would say removing their hands out of their pockets. Yeah, that this is a true seizure without question. I mean, the court, we're looking at the record. We can affirm on any basis. The trial judge had his own notions about the testimony. You believe he had it all wrong. But give me your best case for the idea that when an officer walks up to somebody and says, hey, would you stop walking, and then he says, would you take your hands out of your pockets, that that is a seizure. I would argue Smith. Okay. How about Peeble v. Jackson, 209 case, 389 Illinois appellate, 283. Yes. What's your best case? Yours, Ms. Green. I would say Smith. I would also argue Ocampo. Okay. In Smith, the defendant was standing in front of a known drug house not doing anything. The officers approached him, told him to remove his hands from his pockets. He backs away and, again, is told to take his hands out of the pockets. Was that the one where it was like three or four times or no? That was Jackson, I thought. That he was asked to remove his hands from his pockets? Three or four times. In Smith, he was asked to remove them multiple times, at least twice. Okay. All right. Yeah, Jackson was two times. Okay. And in Smith. Jackson was three or four, according to the reported decision. But, you know, we're just quibbling. The reported decision is kind of what we usually base our facts on. Of course. In that case, it's been reported that it was three or four times. Okay. So I don't know. I don't know where the two came from. But Smith is your case. You really think it's a good start. I would say Smith. And there was a comment in Smith that the court would ordinarily find a seizure where the defendant is told to stop and remove his hands from his pockets. But I think specifically, and I'm going to go back to this again, just the odd nature of what Raphael did is not a natural reaction to can you please remove your hands from your pockets? Or would you take your hands out of your pockets? Or would you take your hands out of your pockets? All right. Is everything that you're basing this on, though, the suggestion that the record clearly supports your conclusion that the officer ordered him to put his hands up in the air? Yes. If we're, and I don't want to indicate that there's a difference between, you know, ordered and told, he told him to put his hands up. And I would suggest that, again, because of what he did, because he did this, it's unnatural unless you've been told with a tone, with a certain tone, with a certain amount of authority. It's just an odd thing to do unless you were told to do something like that. Did he tell him to stop first? He did tell him to stop first. I would say the seizure starts there. The first command was stop. Yes. Or was it would you stop walking? You know, again, the record speaks for itself. We can't make the record say one thing. We have to rely on the actual record. We can't, like, you know, say, he said stop. We have to look at the record and see what the officer actually said. I agree with that, Your Honor. All right. I would just, I would just suggest or, or, you know, look at another reading, and I believe that the officer did say, not that he told him to put his hands straight up in the air, but that he told him to put his hands up. Yes. And he also said stop versus stop walking. He also said stop. Yes. Now, the, with respect to the, you know, asking him to take his hands out of the pockets, there was also nothing to indicate that Rafael was armed or dangerous. There wasn't any testimony with respect to a bulge or the butt of a gun or any indication that Rafael was, was armed or dangerous at that point. Are there any more questions? We've asked that this court vacate the court's order and reverse the adjudication of the latency. Thank you. Good morning. May it please the court. Again, my name is Whitney Bond representing the state of Illinois. The court should affirm the trial court's denial of the minor respondent's motion to quash arrests and suppress evidence where the stop effectuated by Officer Milan evolved from a consensual encounter to a proper stop under Terry. Now, at the original hearing, you didn't argue this was a consensual encounter, did you? No. What about Ms. Green's suggestion that here there's clear evidence on the record that the officer told him to stop, whether he said stop or stop walking, you know, the record shows one way or the other. But either way, he was told to stop. And it's a uniformed officer, as I recall, in a squad car. The young man stops. And then the officer also tells him to take his hands out of his pockets. Isn't that a command? I believe it is. And what we need to look at, though, are the totality of the circumstances. What Officer Milan testified to is that he was a seven-year veteran of the saturation team. He personally had made several arrests on that same block prior to this occasion. And when he saw the minor respondent that morning, immediately upon recognizing that this was an officer, uniformed, with a partner in a marked squad car, he turned and walked immediately in the other direction, briskly away. And as Justice Gordon pointed out, it's not like fleeing, is it? No, it's not fleeing in that it's running. I believe in Wardlow, I mean, I think the flight was pretty obvious that he took off running. But Wardlow doesn't go so far as to say that the only way that somebody could be considered fleeing is by running. Wardlow basically said that headlong flight in an area of high narcotics traffic was actually enough for the officers to have a reasonable suspicion to stop that individual, right? That's 100% correct. And there wasn't any testimony about observing him do anything related to narcotics. It was simply headlong flight in an area known for high narcotics traffic. And the people submit that's exactly what we have here. Well, I think there's a difference between walking briskly and running. Obviously. Obviously. I'm not trying to say that briskly walking is the same as a flat-out sprint. But I'm also saying that in looking at these circumstances and using some common sense rationale, this minor respondent clearly evidenced an intent to depart the area quickly from this officer. And what the people are submitting is not that. Well, there's no evidence that he was walking away from the police car. He was walking away from the individuals. I mean, where's the evidence that he was walking away from the police car? Well, Officer Milan testifies that when he first spotted these individuals, including the minor respondent, he was only 20 to 25 yards away. When he got closer to approximately 15 yards away, he noticed that the minor respondent saw this car and immediately turned and walked in the opposite direction briskly. Now, Officer Milan, as Terry notes, it would have been poor police work on behalf of Officer Milan at this point, who's a seven-year veteran, who's made arrests on the same block, to not investigate this minor respondent's evasive behavior. And he does. I mean,     this is a minor respondent. He can approach the minor respondent and say, well, this is a minor respondent. Any officer can approach a citizen on the street and ask if they're merely willing to listen. They did pull up next to him. They were able to catch him driving parallel, and they asked him to stop walking. Is that the way the record reads? I mean, is there testimony that they pulled up parallel to him and asked him to stop? Or is it that one of the officers got out of the car? They pulled up parallel next to him, asked him to stop walking. Then Officer Milan exits his vehicle, and the record is silent as to what the other officer does. And actually, the record is silent as to what he does, right? Yes. It just says that he… The respondent, I mean. Yes, it is silent. And Officer Milan, at that point, exits his vehicle, and he notices now that this minor respondent has put his hands in his pockets from the time that he's noticed the police, and his hands are still in his pockets. At no time… So is there something about putting your hands in your pockets that's evasive? I would suggest that it is evasive. I would suggest that, looking at the totality of the circumstances… What case would you cite for that one? I would cite… Well, you could cite Jackson. When you're talking about… In Jackson, there was no flight. It was a high narcotics area, and there was suspicious, erratic behavior that the court found was enough to sustain, or excuse me, deny the motion to quash based on reasonable, articulable suspicion. Here, what we're arguing is that this minor respondent was… It's uncontroverted. This is a high crime area. High narcotics. Excuse me, a high narcotics area. I misspoke. A high narcotics area. He fled with his hands in his pockets. Now, the test under Terry is that the officer need not be absolutely certain that this minor respondent is armed. The test is whether a reasonably prudent person, in these circumstances, would be warranted in their belief that their safety was in danger. And every officer, police officer on the street, if they were faced with a situation where they're in a known high narcotics area with a briskly walking away respondent, whose hands have been in their pockets the entire time, certainly that same officer, as Officer Melande… Yeah, but what case holds that? Ward law didn't say that. Oh, Terry said that. If Terry says that the issue is a reasonably prudent person, in this circumstance, it would be warranted in their belief that this person is in danger, that Officer Melande could be in danger. Well, I don't think it says that. But how about People v. Garcia, where it says, absent some additional evidence of illicit activity, the mere possession of a clear plastic bag protruding from a person's front pants does not constitute probable cause to seize the baggie. Well, at this point, and that essentially is what the trial court found here, is that this was initial probable cause. There was no, he wasn't making… I mean, what justifies the search? Let's assume that everything else you say is correct. What justifies the search? Well, Terry justifies the stop. And at this point, there was no search. Terry justifies the stop in asking him to remove his hands from his pockets. An incident to removing his hands from his pockets, in plain view, was a bag of narcotics. At that point, the officer had no choice. It was a Ziploc, not a bag of narcotics. I'm sorry? It was a Ziploc. Excuse me. A Ziploc bag with 10 plastic baggies inside that the officer believed was suspect heroin. Well, how do you justify that with Garcia? Or maybe you could say People v. Garcia was wrongly decided. I wouldn't say it was wrongly decided. Yeah, careful. He wrote the… No, actually, Sheldon Hall did. But in that decision, Officer Romano wasn't a saturation team officer. And she specifically gave no testimony whatsoever about her experience or prior experience making narcotics arrests. And she specifically didn't say that, in her opinion, that the little plastic she observed in the front pants pocket of an individual she'd stop for a traffic stop, that there was any suggestion by her that that was narcotics. And that's… We don't have any of that here. I mean, what we do have here is an officer who specifically testified that he… relating his experience with narcotics transactions, and that the baggie was clearly evident to him, and he immediately suspected it to be suspect heroin. Well, did the trial judge make any findings about plain view? Well, the… Judge Lubin stated that the issue for him in his finding was that it was one of probable cause and that the officer had it based on seeing the bag and his experience as a police officer. So the words plain view didn't come out of his mouth. Well, did he say that baggies are used for sandwiches, and people do put their lunch in baggies, but usually they don't put them in their waistbands, and that the officer believed it was narcotics, and upon seeing it in plain view, he had a right to seize what he believed was narcotics? He didn't say anything about anything other than what Officer Milan thought. He didn't say something about baggies could be used for lunch? You know what, I don't quite remember. I know that I quoted Judge Lubin's… Well, I've read the findings, and Judge Lubin specifically stated that, yeah, people can put lunch in baggies, but in this case, but they don't usually put their sandwich lunch baggies in their waistbands, in their underwear, and that the officer, when he testified that he believed that those baggies were contraband or narcotics, that that was based on his experience and knowledge, and that that wasn't really out in left field. Now I'm paraphrasing, but he did mention that, yes, you could have a sandwich in a baggie, but he didn't believe that, in this case, that the respondent had a sandwich in his waistband of his pants. Well, didn't the officer say that he observed the bag, but didn't ask any further questions, and then just did a custodial search and then found narcotics that way, by taking the bag out of his waistband? And I don't, I'm just briefly reading my own, but I don't recall, and I don't want to put words. But he took the baggies because he thought it was dope. Well, he took them, and he took them into custody and performed a custodial search. Yeah, I mean, the custodial search revealed other. The second bag. One was heroin, one was cocaine. Right. One was in the back pocket, one was in the waistband. Right. So when he saw, I mean, that's what he, he couldn't do anything else. I mean, once the officer saw something that he suspected to be suspect, heroin, I mean, obviously he has to, I mean, now you. I'm not sure about the record, because we don't have it right here in front of us, but what is your recollection about the officer's testimony regarding what he asked or ordered the respondent to do, related to his hands and the pocket routine? What did he say that you made or made not know? He stated that he asked the minor respondent to remove his hands from his pockets. Then they tried to clarify that on recross, I believe, and the question was, did you tell him to take his hands out of his pockets? And he said, no, I told him to put his hands up. So he says, and he clarifies upon further questioning, I told him to put his hands up. And then he didn't tell him to put them straight up, he put them up. So my recollection of evidence is that he first tells, testifies that he told the minor respondent to remove his hands from his pockets. And then upon trying to clarify that, it became, I told the minor respondent to put his hands up. So there was a telling. There was a question preceding that that said, did you tell him to put his hands up in the air? And he said, no. Okay. And then Judge Lubin made findings of it. Did he not? He did. And he said that the officer told him to take his hands out of his pockets, which is in the record. Yes. And then there's, well, there's multiple discussions about this. And then Judge Lubin said, if he had simply put his hands or taken his hands out of his pockets, like he was asked, which he was asked, according to the record, there's multiple discussions, then his arms, his shirt would never have been exposed. And that when he put his hands up in the air, his shirt was exposed, or his shirt, excuse me, his shirt exposed the baggie in the waistband of his underwear. Yes. And that the officer, believing that was suspect narcotics, removed the baggie from the waist, which was in plain view. That's what I believe is how Judge Lubin summarized his findings of fact and his conclusion as to the law regarding whether or not the motion to suppress should be granted or denied. Yes. And that's based on his reading. You can, you know, argue what you believe the record shows, but, again, you know, the record does say what it says. And this court can affirm for any reason. The record, as Justice McBride has been pointing out, there is several questions about the removal of the hands. But regardless of where we come down in explaining it and rereading the record, the fact remains that this was a valid Terry stop and that Officer Milan had reasonable articulable suspicion. And I would also like to point out that he took a very minor step in attempting to perhaps protect himself from. What did they do in Terry? Did they pat him down? Yes. Or did they ask him to take his hands out of his pocket? No. In Terry they patted him down. But there. Did they pat him down or did they ask him to take his hands out of his pocket? They patted him down. So it's difficult to argue that Officer Milan's directive to the minor respondent was in error when he didn't search him and instead used the absolute least intrusive means possible to neutralize a potentially harmful situation. But there's certainly authority out there. Is there not? It says that if you tell someone to take their hands out of their pockets, that you could be seizing them? Sure. So was this a seizure or not? Yes. If you told the minor respondent to take his hands out of his pockets, put his hands up. Yeah. Valid seizure under Terry. Is that a Terry stop or is that a seizure? Valid stop under Terry. Okay. So it's not a seizure. It's a Terry stop. Well, I would be saying yes. And if it's a Terry stop, you're going on Illinois versus Wardlow where there was a headlong flight, somebody running in an alley, here there's a guy walking briskly. It's quite a difference. I would submit it's not that big of a difference. I mean, when you talk about flight and you're not talking – Wardlow, I think, was very smart in that it didn't specifically say that flight has to be running. I mean, what if somebody was on a skateboard or decided to scale a fence, but they did it not running but still flight? And here you have an officer who is a seasoned officer in a high-crime narcotics area. All right. So we would be taking Wardlow one step further from running to walking? I don't think you need to take it from running to walking, but briskly walking away is definitely a flight. It's just maybe he couldn't run. Maybe he has a knee injury. I mean, the fact remains is he was trying to get away from this officer. And, like Terry, the record here evidenced the tempered act of a police officer who, in the course of his investigation, had to make a quick decision as to how to protect himself from possible danger, and he took a very limited step in doing so. He told him to take his hands out of his pockets. When looking at the totality of these circumstances, there is indeed a legitimate governmental interest that strongly outweighed the slight intrusion upon the minor respondent's Fourth Amendment interests. And if there are no other questions, for these reasons and those included in our brief, we ask that you affirm the trial court's denial of the minor respondent's motion to quash arrests and suppress evidence. Thank you. Butler? Just briefly. I did locate the record site. It is on R-22 and R-23, as Jessica McBride indicated, where the officer says, I told the minor to put his hands up after I saw him with his hands in his pockets. But I wanted to talk about the flights and the high crime area. Now, it's been established that, you know, saying an area is a high narcotics area, you know, it's got to be more than just it's a poor, you know, minority area. But I would also suggest that there's got to be more than just saying I've made, you know, arrests at this location. There really does have to be a nexus between the crime, the narcotics activity, and what the officer sees the individual doing. Or else anybody who lives in that area, who happens to live in a high narcotics area, would be, you know, legally subject to a stop just for walking away when the police are in the area. And with respect to flights, you know, there is a policy discouraging fleeing. And this is in People v. Thomas. Street pursuits always place the public at some risk. And that's the policy behind why, you know, against fleeing. And here there wasn't that. There was no risk to the public. So it cannot be characterized as fleeing just because he riskily walked away. Are there no further questions? No. All right. Thank you. Thank you, guys. A very interesting case. The briefs were very well done. The arguments were very well done. We'll take the case under advisement. The arguments were very well done. I vote yes.